# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3215-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.D.K.,[1]

     Defendant-Appellant.

_____

Argued May 12, 2026 – Decided June 11, 2026

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 20-01-0010 and Accusation No. 19-10-0970.

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alison Gifford, of counsel and on the briefs).

Robert A. Polis II, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae,

---

[1] We use initials to protect the privacy of the victim. See R. 1:38-3(c)(9), (12).

Cumberland County Prosecutor, attorney; Robert A. Polis II, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant J.D.K. appeals from convictions for sexual assault and endangering the welfare of a child. He asserts reversal is warranted because his constitutional rights to self-representation and to confront a non-testifying witness were violated. Defendant further contends resentencing is required because the trial court committed sentencing errors. Following our review of the parties' arguments, the record, and the applicable law, we affirm.

## I.

We summarize the salient facts from the record relevant to defendant's issues on appeal. In September 2020, the Division of Child Protection and Permanency (Division) learned that A.R.—who was born in March 2008 and was twelve years old at the time—was pregnant. After the Division informed the New Jersey State Police (NJSP), Detective Sergeant Tyler Dornewass initiated an investigation. Dornewass and Cumberland County Prosecutor's Office Detective Ed Bellin interviewed M.S., A.R.'s mother, on September 11, 2020. Dornewass learned that M.S. was dating defendant.

Dornewass and Bellin also interviewed A.R. the same day. After interviewing M.S. and A.R., the detectives were "led to believe that" A.R.'s

"biological father was the father of [A.R.'s] child." Thereafter, the investigation led Dornewass to suspect defendant.

Dornewass interviewed defendant on September 17, 2020. After defendant waived his Miranda[2] rights, Dornewass and NJSP Detective Sergeant Andrew Abdill conducted an audio-recorded interrogation of defendant. Defendant admitted to having sexual intercourse with A.R. "many times," recollecting "five or six times" at two separate residences. Defendant recalled first having sex with A.R. in 2019. He relayed she would "touch[] . . . [his] d*ck" "like she wanted it bad," and they would kiss. He would have sex with A.R. without a condom but would "pull out" before ejaculating.

During the investigation, Dornewass consensually secured buccal[3] swab samples for DNA from A.R., her biological father, and defendant. On September 18, 2020, M.S. and A.R. were each reinterviewed. Additionally, in October 2020, Dornewass obtained an amniotic fluid sample from A.R. for a DNA profile of her unborn baby. In January 2021, A.R. gave birth to a daughter.

---

[2] Miranda v. Arizona, 384 U.S. 436, 479 (1966).

[3] A "[b]uccal cell collection involves wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." State v. Gathers, 234 N.J. 208, 215 n.2 (2018) (quoting Maryland v. King, 569 U.S. 435, 444 (2013)).

A-3215-23

On January 2, 2021, a grand jury charged defendant with two counts of first-degree aggravated sexual assault (counts one and two), N.J.S.A. 2C:14-2(a)(1), and two counts of second-degree endangering the welfare of a child (counts three and four), N.J.S.A. 2C:24-4(a)(1). The State thereafter moved to admit at trial defendant's recorded statement to police. The court granted the motion, ordering proper redactions of his statement.

More than two years after defendant was indicted, on February 21, 2023, defense counsel filed a motion for defendant to proceed self-represented. About two months later, the court held a hearing on the motion. The court confirmed defendant had an opportunity to meet with defense counsel and explained to defendant that the trial date was set.

The court engaged in an extensive colloquy with defendant about his decision to proceed self-represented. Defendant expressed a desire to cross-examine witnesses himself because he "kn[ew them] personally." The court explained to defendant that if he was convicted on one of the aggravated sexual assault charges, a mandatory minimum of twenty-five years without parole would be imposed, and if the sentence was in excess of twenty-five years, he would have to serve eighty-five percent of the term before parole eligibility. Defendant confirmed his sentencing exposure. The court further highlighted the

4

"possibility of consecutive sentences" because defendant was charged with two counts of aggravated sexual assault.

In addressing the State's alleged evidence and defendant's desire to cross-examine witnesses himself, the court explained that the State may elect not to call A.R. to testify because it had "biological proof." The court reconfirmed defendant's understanding of the "nature of the proofs" and "consequences if convicted." Additionally, the court clarified the last-extended plea offer was for a seventeen-year term of imprisonment and would be withdrawn once the trial began.

The court stated multiple times that it could not "get an answer on" defendant's late application to represent himself. Defendant explained that he had only recently received information from defense counsel. The court reiterated that the question was whether defendant wanted "to withdraw the motion" to represent himself and instead proceed with counsel. Defendant responded, "I mean[,] if I am going to represent myself, I[ will] represent myself." (Emphasis added).

The court inquired further about defendant's legal education and experience, informing him of the requirement to comply with the same legal standards as counsel. The court asked defendant multiple questions regarding

his knowledge and sought to verify his understanding, but defendant repeatedly responded with "[m]m-hmm." Regarding defendant's inability to later seek post-conviction relief, the court explained he would "basically" be "deprive[d] . . . of ineffective assistance of counsel" claims "if convicted" because he represented himself. Despite acknowledging the court's explanation, defendant admitted not understanding post-conviction relief. Defendant also conceded he did "[no]t know" how he would represent himself.

The court informed defendant that the State intended to call medical and scientific experts and detectives to testify, inquiring if he knew there were rules governing cross-examination. Defendant maintained he could "cross-examine [the] victim," and the court again explained A.R. may not testify and consent was "not a defense." After defendant asserted intoxication was a defense to the charges, the court asked whether that position was "predicated on [his] own subjective thought," or if he had verified and discussed the strategy with defense counsel. Defense counsel confirmed it was discussed, stating defendant "[kept] bring[ing] [it] up." The court informed defendant he could raise his alcohol consumption "prior to the events . . . [as it was his] right[] to do that." However, the court noted it "[was] [a] very difficult" and "unlikely defense," noting there

6

were multiple allegations of sexual assault and a young "girl under the age of [thirteen]" was "impregnated."

The court explicitly told defendant it would "do whatever [he] want[ed]," asking again if he wanted to represent himself. After defendant stated, "I think I[ will] represent myself," the court accepted his decision. The court explained the trial would proceed, defendant was bound to follow legal standards, and defense counsel was "appointed" as standby counsel to assist him. The court advised defendant that the jury would be told he was representing himself.

The court then questioned defendant to confirm his knowing and intelligent waiver of the right to counsel. Defendant acknowledged seeking to be self-represented as he had "zero faith" in defense counsel. Regarding the risks involved, defendant confirmed the risk was justifiable because he was the "only one" who knew what had happened. Defendant asserted that defense counsel maintained defendant's trial strategy was not possible. The court advised defendant it would further discuss the intoxication defense jury charge based on his statements.

Regarding the voluntary intoxication charge, the court advised defendant it would instruct the jury that "[g]enerally, a defendant is not relieved of criminal responsibility because he is found to have acted under the influence of an

7

[intoxicating] beverage or drugs. The general assumption is that every person is normal and is possessed of ordinary . . . [faculties]" and "the State need not prove that the defendant was sober." After the court inquired if he understood "what qualification of [an] expert is" and the gravity of a first-degree offense, defendant answered "no" and he "d[id not] know." The court asked defendant about addressing the jury and he acknowledged not having an opening statement. The court stated his responses were indicative of "the definition of not understanding what [he was] doing."

Defense counsel argued defendant had the constitutional right to self-representation even though the "decision may be fraught with . . . risks" and emphasized the "existence of risk provide[d] no basis to deny" self-representation. Further, defense counsel stated that the focus was on whether "defendant actually [understood] . . . the consequences of his waiver." The court explained to defendant that he could still elect for defense counsel to represent him. The court also expanded its explanation on post-conviction relief, resulting in defendant asserting that he understood "[a] little bit."

After defendant confirmed he was electing to exercise his constitutional right to self-representation, the court found defendant knowingly and voluntarily waived his right to counsel. The court noted the motion was granted despite

defendant showing a "complete lack of comprehension of what [wa]s going on," the "risks he face[d]," "the [State's] proofs," and "the consequences of [his] decision." As it accepted defendant's self-representation decision, the court noted it was concerned because defendant was "smirk[ing]." After witnessing defendant's expressions and responses, the court inquired whether defendant wanted "to go to prison for the rest of [his] life," and he responded, "if that[ is] what it takes."

After granting defendant's motion, the court proceeded with the trial. Defendant then asked if the court thought he should keep defense counsel. The court explained that if defense counsel represented him, and errors were committed, defendant would have the opportunity to seek post-conviction relief. Defendant was also advised that self-representation would preclude the ability to seek such relief. Defendant then stated, "All right." The court asked again, "[W]hat do you want?" Defendant asserted he wanted defense counsel to represent him. The court asked whether defendant was "withdrawing [the] application to represent [him]self," and defendant stated, "Yes."

Defense counsel stated he believed "the colloquy overbore [his] client's" right. The court asked defense counsel if he wanted time to "convince [defendant] that he should represent himself," to which defense counsel

9

responded, "No." To address defense counsel's concerns, the court told the parties it would "open" the discussion up "again." Defense counsel responded that was "not necessarily" what he intended. The court explained that it appeared defendant realized, after the post-conviction relief discussion, that he could request a new trial if defense counsel failed to meet "the necessary standard of care." The court instructed defense counsel to "talk it over with [defendant]" and they would reopen the motion "to look at it again."

After a recess, the court revisited defendant's application, "indicat[ing] that [it] would reopen the issue with regard to self-representation." Defense counsel responded, "I believe [defendant,] . . . correct me if I[ am] wrong, but you[ are] withdrawing your application to represent yourself. Is that correct?" Defendant answered, "Yes." After establishing defense counsel had "access to" meet with defendant, the court confirmed there were no further issues raised.

At trial, Dornewass testified about the investigation and introduced defendant's redacted statement, which the State played for the jury. Theresa Nezezon, a DNA scientist with the NJSP Office of Forensic Sciences DNA Laboratory, testified about her experience and DNA evidence. She explained a DNA analysis of the amniotic fluid and buccal swab samples revealed that it was "[seventeen] trillion times more likely given th[e] baby's [DNA] profile

that . . . [A.R.] and [defendant] are the [baby's] parents versus [A.R.] and some randomly selected person."

A.R. testified that she gave birth to a daughter in January 2021. She stated she had lived with defendant and he fathered her child. She recalled initially reporting her biological father had committed the sexual assault because she "did[ not] want [defendant] to get in trouble."

On May 25, 2023, the jury convicted defendant on all counts. At the time, defendant had a pending violation of probation (VOP) that was filed in April 2020.

On March 27, 2024, the court sentenced defendant. Defense counsel asked the court to rely on defendant's submitted sentencing memorandum. Defense counsel's oral argument focused on defendant's difficult life, arguing it resulted in his poor choices. Specifically, he emphasized the court should consider that defendant: spent extensive time in the "foster system" from a very young age, had never known his father, suffered abuse in the foster system, was addicted to methamphetamine, "has a learning disability," discontinued his education after ninth grade, and had deep remorse. Defense counsel asked the court to sentence defendant to the minimum mandatory penalty.

Defendant addressed the court, requesting leniency and consideration of the fact that his daughter is "not even going to know her dad." Defendant represented that he "always promised . . . God that when he gave [defendant] a daughter," defendant "would change." Defendant explained that he was conceived after his biological father, who was dating his maternal grandmother, had sexual relations with his mother. He stated his "biological father was in the same situation as [him]." He requested a sentence of less than twenty-five years.

In imposing defendant's sentence, the court recognized defendant's criminal history and noted he was thirty-two years old. The court acknowledged the State had withdrawn its motion for an extended term. The court applied aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk that the defendant will commit another offense), finding defendant was "bound to commit [crimes] again" based on the record and there was a "substantial risk of re-offense." The court found aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the defendant's prior criminal record and the seriousness of the offenses), and assigned it moderate weight as defendant had two prior criminal convictions. In applying aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterring the defendant and others from violating the law), the court found there was a need to deter defendant and afforded the factor substantial weight.

A-3215-23

The court found no mitigating factors, explaining it was unpersuaded by defendant's arguments and highlighting that it did "not see how anything that happened to [defendant] justifies what [he] did to [A.R.] and [his] own child." Additionally, in finding no mitigating factors, the court believed defendant's substance abuse problem would "be an impediment to his ability to remain lawful or otherwise lead a productive life." The court explained the aggravating factors weighed heavily as there were no applicable mitigating factors.

The court sentenced defendant to concurrent forty-year terms of imprisonment, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act on the two aggravated sexual assault counts. The court also ordered defendant to comply with the provisions of Megan's Law, N.J.S.A. 2C:7-2, and parole supervision for life, N.J.S.A. 2C:43-6.4. On the two endangering counts, the court sentenced defendant to two eight-year terms of imprisonment to be served concurrent to each other and the sexual assault counts.

The court also addressed defendant's VOP. The court found defendant was placed on probation on December 20, 2019, following a conviction for fourth-degree impersonating a law enforcement officer, N.J.S.A. 2C:28-8(b). While defendant was on probation in 2020, he sexually assaulted A.R. The court

13

noted A.R. delivered her daughter in January 2021 and the child was "conceived [with defendant] during . . . 2020." The court resentenced defendant on the VOP to a term of imprisonment of eighteen months consecutive to his sentence for the offenses against A.R.

In considering the factors established in <u>State v. Yarbough</u>, 100 N.J. 627, 644 (1985), the court determined that even though the aggravated sexual assaults were "separate and [defendant] was convicted of two specific crimes," counts one and two should be concurrent. After finding the endangering counts did not merge based on the additional elements, the court determined counts three and four should also run concurrently. Finally, the court noted that because the VOP was a resentencing, it would be consecutive to the other offenses. The defendant's aggregate term of imprisonment was forty-one years and six months.

On appeal, defendant raises the following contentions:

POINT I

DEFENDANT'S CONSTITUTIONAL RIGHT TO SELF-REPRESENTATION WAS VIOLATED BECAUSE THE TRIAL COURT FAILED TO ENGAGE IN THE REQUISITE INQUIRY WITH DEFENDANT AFTER HE CLEARLY INDICATED THAT HE WISHED TO REPRESENT HIMSELF.

<u>POINT II</u>

DEFENDANT'S RIGHTS TO CONFRONTATION AND DUE PROCESS WERE VIOLATED BY OFFICER TESTIMONY THAT A NON-TESTIFYING WITNESS ACCUSED DEFENDANT OF THE CHARGED CRIME.

<u>POINT III</u>

DEFENDANT MUST BE RESENTENCED BECAUSE THE COURT FAILED TO ADDRESS THE MITIGATING FACTORS RAISED BY DEFENSE COUNSEL, IMPERMISSIBLY CONSIDERED DEFENDANT'S SUBSTANCE ABUSE AS AN AGGRAVATING FACTOR, AND IMPOSED CONSECUTIVE SENTENCES ABSENT THE NECESSARY <u>YARBOUGH</u>/<u>TORRES</u> ANALYSIS.

II.

Defendant contends reversal of his convictions is warranted because the court violated his constitutional right to self-representation by accepting his decision to proceed with counsel. Specifically, defendant argues the court failed to conduct a sufficient inquiry, ensuring he waived his right to self-representation before choosing to proceed with his constitutional right to counsel. After a review of the record, we are convinced defendant knowingly and voluntarily withdrew his motion to proceed self-represented.

We review a court's determination on a defendant's application to proceed self-represented for an abuse of discretion. State v. King, 210 N.J. 2, 15 (2012); State v. DuBois, 189 N.J. 454, 475 (2007). "The right [of self-representation] is either respected or denied; its deprivation cannot be harmless." King, 210 N.J. at 22 (alteration in original) (quoting McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984)). "When a defendant's right of self-representation is violated, reversal of the defendant's conviction is warranted." State v. Outland, 245 N.J. 494, 507 (2021).

A "court should not focus on whether a [self-represented] defendant will fare well or badly," but "it must ensure that he [or she] knows and understands that, by his [or her] choice, he [or she] may not do well." State v. Reddish, 181 N.J. 553, 592 (2004). Questions on "technical legal knowledge" are "essentially immaterial," and the pertinent determination is whether the defendant "comprehended the risks and consequences of acting as his own attorney." King, 210 N.J. at 20-21.

"It is for the court to determine whether an accused has knowingly and intelligently waived that right and to establish the waiver on the record." State v. Crisafi, 128 N.J. 499, 509 (1992). "The defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will

16

establish that . . . "his [or her] choice is made with eyes open.'"" Id. at 510 (quoting Faretta v. California, 422 U.S. 806, 835 (1975)). The trial court must engage in a searching inquiry on the record to ascertain whether a defendant is adequately informed of:

> (1) the nature of the charges, statutory defenses, and possible range of punishment; (2) the technical problems associated with self-representation and the risks if the defense is unsuccessful; (3) the necessity that defendant comply with the rules of criminal procedure and the rules of evidence; (4) the fact that the lack of knowledge of the law may impair defendant's ability to defend himself or herself; (5) the impact that the dual role of counsel and defendant may have; (6) the reality that it would be unwise not to accept the assistance of counsel; (7) the need for an open-ended discussion so that the defendant may express an understanding in his or her own words; (8) the fact that, if defendant proceeds [as self-represented], he or she will be unable to assert an ineffective assistance of counsel claim; and (9) the ramifications that self-representation will have on the right to remain silent and the privilege against self-incrimination.
>
> [DuBois, 189 N.J. at 468-69.]

In the present case, the court engaged in a thorough inquiry to ensure defendant was adequately informed before it determined defendant knowingly and intelligently withdrew his motion to proceed self-represented. After pointing out defendant moved to be self-represented two years after he was

indicted, the court addressed the motion and granted his application to proceed without counsel before defendant withdrew the application.

The court discussed with defendant the charges against him and his sentencing exposure, the risks associated with proceeding self-represented, the applicable standards, the ramifications of representing himself, and the inability to later assert an ineffective assistance of counsel claim. Each time defendant expressed his lack of understanding and stated only "[m]m-hmm," the court sought to clarify and address the issues. The court also verified that defendant discussed the relevant issues and his concerns with counsel. Defendant's assertion on appeal that the court "failed to conduct the requisite inquiry" is belied by the record.

We further note defendant's argument fails to address his equivocation during the court's inquiry as to whether he wanted to proceed self-represented. Defendant's vacillation caused the court to ask multiple times how defendant wanted to proceed, which further necessitated continuing the colloquy. By example, the court questioned defendant after he qualified an answer with "if" he proceeded self-represented and admitted being unsure how he would advocate for himself. Defendant had also confirmed he was unprepared, had no opening statement, had no understanding of how to conduct an expert's cross-

18

examination, and had no knowledge of trial standards. Defendant's responses, failure to directly answer questions, and demeanor required the court to conduct an in-depth inquiry to elicit defendant's knowing and intelligent waiver of his right to counsel.

The record reflects defendant was either truly undecided on whether he wanted to proceed self-represented or, for alternative reasons, was "wavering between assigned counsel and self-representation." Crisafi, 128 N.J. at 517. Again, only after the court had granted defendant's self-representation motion and had appointed standby counsel, did defendant ask further questions, affirmatively waive his right to self-representation, and withdraw his motion.

The record evinces defendant knowingly exercised the right to counsel after learning he would be held to the same trial standards as counsel and lose the ability to file a post-conviction relief application for ineffective assistance of counsel. Defendant's knowing and intelligent decision to elect to proceed with counsel is further supported by the fact that defendant never sought to readdress his self-representation motion, despite the court offering to re-open the discussion and providing a recess so defendant could further consider his decision. "The trial court repeatedly gave defendant the choice between representation by trained counsel and proceeding [self-represented]." Ibid. We

19

are convinced the court conducted a searching inquiry as to defendant's fair exercise of his constitutional rights. We, therefore, conclude that "defendant intentionally relinquished a known right." State v. Rose, 458 N.J. Super. 610, 635 (App. Div. 2019).

III.

Defendant next contends reversal is warranted because his rights to confrontation and due process were violated by Dornewass' testimony that a non-testifying witness reported defendant "might be or was a suspect." Defendant specifically argues Dornewass' testimony provided the jury with the "inescapable inference . . . that a non-testifying witness accused [defendant] of sexually assaulting [A.R.]" Because defendant did not object at trial, we review this issue for plain error.

Our Supreme Court in State v. Bankston explained that when an "officer becomes more specific by repeating what some other person told him concerning a crime by the accused[,] the testimony violates the hearsay rule." 63 N.J. 263, 268 (1973); State v. Watson, 254 N.J. 558, 610 (2003). "Moreover, the admission of such testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him." Bankston, 63 N.J. at 269. However, we recognize "there are circumstances in which an officer will be allowed to testify,

based generally on hearsay evidence, to explain the course of his or her investigation." State v. Frisby, 174 N.J. 583, 592 (2002).

When an officer provides reasons related to his or her actions in an investigation, the hearsay rule is not violated because the testimony is offered "to show 'the officer was not acting in an arbitrary manner or to explain his [or her] subsequent conduct.'" State v. Medina, 242 N.J. 397, 413 (2020) (quoting Bankston, 63 N.J. at 268) ("[T]he hearsay rule is not violated when a police officer explains the reason he [or she] approached a suspect or went to the scene of the crime . . . ."). In reviewing the testimony, we examine whether it "leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt." Bankston, 63 N.J. at 271; see also State v. Roach, 146 N.J. 208, 224-25 (1996).

A party's "failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry." State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404 (2019)). Our Supreme Court has stated that "[p]lain error has intentionally been created as a high bar for parties to meet in order to encourage litigants to raise any objections to evidence at the trial level where the court can best 'forestall or correct a potential error,' in a timely manner." Santamaria, 236 N.J.

at 409 (quoting State v. Bueso, 225 N.J. 193, 203 (2016)). "The mere possibility of an unjust result is not enough." State v. Canfield, 470 N.J. Super. 234, 273 (App. Div. 2022).

Defendant argues Dornewass testified about "learn[ing] information" that made him think defendant was a suspect in the sexual assaults. A review of Dornewass' testimony at trial in context is relevant to our determination. The prosecutor had asked Dornewass about the investigation interviews he conducted. Dornewass explained he conducted defendant's interview. The prosecutor asked, "throughout your . . . investigation leading up to [defendant's interview], did you learn information that made you or other members of [the NJSP] think [defendant] might be a suspect?" Dornewass replied, "Yes," and thereafter answered questions about the interview locations and whether defendant was informed of his Miranda rights. Reviewing the context of Dornewass' testimony demonstrates that the line of questioning pertained to how the investigation was conducted and to show defendant's interview was not arbitrary. We note Dornewass provided no information regarding who provided the information or what he was told.

For these reasons, we are unpersuaded by defendant's contention that Dornewass' limited testimony violated defendant's right to confrontation of a

non-testifying declarant. Stated another way, because Dornewass' answer was an explanation as to the reason for continuing the investigation and interviewing defendant, we discern no plain error.

IV.

Defendant next asserts resentencing is required because the court failed to address mitigating factors raised by defense counsel and improperly considered defendant's substance abuse as an aggravating factor. Additionally, defendant contends the court imposed consecutive sentences without conducting the required analysis under Yarbough and Torres.

An appellate court's standard of review of sentences is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentences unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record'; or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Once a sentencing court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within

the permissible range for the offense." State v. Morente-Dubon, 474 N.J. Super. 197, 208 (App. Div. 2022) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)); see also State v. Case, 220 N.J. 49, 65 (2014) (instructing appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record"). When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a).

In Yarbough, our Supreme Court established "general sentencing guidelines" that a court must consider when deciding whether to impose consecutive sentences. 100 N.J. at 643-44. The Supreme Court explained that a sentencing court must evaluate whether:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

[Id. at 644.]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348 (citing State v. Molina, 168 N.J. 436, 442-43 (2001)).

A "sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case." Ibid. "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller, 205 N.J. 109, 129 (2011). An explanation of the "overall fairness" is necessary "to 'foster[] consistency

A-3215-23

in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" State v. Torres, 246 N.J. 246, 272 (2021) (alterations in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

At sentencing, the court considered the parties' sentencing memoranda and arguments before determining the applicable aggravating and mitigating factors. Defendant argues the court failed to address mitigating factors two, N.J.S.A. 2C:44-1(b)(2) (defendant did not contemplate that [his] conduct would cause or threaten serious harm), and eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur). After a review of the record, we disagree with defendant's contention.

The sentencing transcript reflects the court acknowledged defendant's mitigating factor arguments, particularly defense counsel's factual assertions regarding defendant's difficult childhood and hardships. While the court did not explicitly reference mitigating factors two and eight by number, the record demonstrates it made findings for rejecting each factor. Our Supreme Court has elucidated that a sentencing "court [i]s obliged to give reasons for rejecting those mitigating factors brought to its attention." Case, 220 N.J. at 69. Defense counsel had argued in support of mitigating factor two that defendant did not

appreciate the harm because he endured great hardship and abuse, but the court was unpersuaded by defendant's "bad childhood," noting it was not "unique." The court pointed out that defendant should have had a greater appreciation for the harm he caused. Further, as to mitigating factor eight, the court found defendant was a "repetitive offender" and there was a "need of specific deterrence." In addition, the court referenced defendant's Avenel report.

We also reject defendant's argument that the court found his substance abuse "in aggravation" because the record demonstrates otherwise. Defense counsel had argued in support of the mitigating factors that defendant had "very serious problems with addiction of methamphetamine" and "other powerful . . . addicting drugs." In addressing defense counsel's mitigating factor eight argument, the court noted defendant "appear[ed] to have a substance abuse problem on top of all these other things that will also be an impediment to his ability to remain lawful or otherwise lead a productive life."

We next address defendant's assertion that resentencing is required because "the court failed to adequately explain its reasons for imposing a consecutive sentence on . . . [the] VOP." Defendant argues the court's limited explanation requires a remand because the VOP "was particularly important" as he "received a lengthy sentence for the new charges" regarding A.R. He also

27 <span>A-3215-23</span>

highlights that "[P]robation . . . recommended that the sentence on the VOP run concurrent to the sentence on the new charges."

The court ordered the VOP to be served consecutive to defendant's sentence on the charges related to A.R. The VOP was for a separate earlier offense, which was unrelated to defendant's sentence on the charges related to A.R. The court highlighted defendant was being "resentenced" on the VOP and determined a "consecutive . . . sentence" was appropriate because he must be held "responsible for his own decisions." Further, the court explained the VOP "was a sentence that was imposed before th[e] charge[s]" related to A.R. "ever came into being." We are satisfied the court's "reasons for imposing consecutive sentences [were] . . . expressly stated." State v. Acevedo, 205 N.J. 40, 44 (2011).

Finally, defendant argues the court did not make Torres findings to "assess the overall fairness of the sentence." The record established that the trial court understood and considered the overall fairness of the sentence. The only consecutive time imposed was eighteen months for the VOP. The court therefore understood that defendant was being sentenced to forty-one and a half years in prison, with forty years subject to NERA. Moreover, the court articulated why the overall sentence was fair given the crimes defendant committed against A.R. "[S]entences can . . . 'be upheld where the sentencing

transcript makes it possible to "readily deduce" the judge's reasoning.'"  State v.

R.A.M., 482 N.J. Super. 439, 460 (quoting State v. Vanderee, 476 N.J. Super.

214, 239 (App. Div. 2023)).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3215-23